UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SHEILA GUIDRY, *individually and*                    CIVIL ACTION
*on behalf of all others similarly*
*situated*, ET AL.


v.                                                   NO. 19-12233


DOW CHEMICAL COMPANY, ET AL.                         SECTION "F"


ORDER AND REASONS

Before the Court is the plaintiffs' motion to remand. For
the reasons that follow, the motion is DENIED without prejudice.

**Background**

This is the second time the defendants have removed this toxic
chemical exposure class action lawsuit to federal court, invoking
the Court's jurisdiction under the Class Action Fairness Act.

On the morning of July 7, 2009, a tank at a Union Carbide
facility in Taft, Louisiana released into the air a chemical, Ethyl
Acrylate (EA). The St. Charles Parish Department of Emergency
Preparedness closed nearby roads and evacuated residents within a
two-mile area east of the facility. Some residents and visitors
in St. Charles, Jefferson, and Orleans Parishes complained of odors
and minor transient physical symptoms such as headaches and

1

vomiting.[1]  Immediately after the EA release, multiple lawsuits were filed, including this one.[2]

On July 29, 2009, Sheila Guidry filed this lawsuit in Orleans Parish against Dow Chemical Company and the State of Louisiana through the Department of Environmental Quality.  She alleged that on July 7, 2009, she noticed a foul smell, which caused her to suffer headache, dizziness, and burning eyes.  The next day, she amended her petition to include class allegations and on August 6, 2009, she amended her petition to name as an additional defendant Union Carbide Corporation.[3]  Dow Chemical removed the case to this Court for the first time on August 12, 2009, invoking the Court's jurisdiction under jurisdictional theories including the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2); the case was assigned Civil Action Number 09-5506.  The defendants argued that Class Action Fairness Act's $5,000,000 amount in controversy prerequisite was facially apparent from the plaintiffs' state

---

[1] The plaintiffs note, without citation, that the state appellate court observed in 2012 that the class representatives made claims of "foul smell, irritation of the eyes, headaches, nausea, anxiety, burning sensation eyes, throat irritation, skin irritation, and shortness of breath, and vomiting" among other transient health effects.

[2] There are apparently 16 lawsuits arising from the EA release pending in St. Charles Parish: 12 are individually joined (but since consolidated) mass actions and five are class action lawsuits.

[3] Praxair, Inc. was also added as a defendant, but was dismissed without prejudice on December 8, 2009.

court petition based on the potential size of the class and awards for similar injuries under Louisiana law.[4]  On March 29, 2010, the Court granted the plaintiffs' motion to remand, rejecting as speculative the defendants' argument anchored to parish population estimates multiplied by dollar amounts recovered by plaintiffs in other similar cases.  See Order and Reasons dtd. 3/29/10.  The Fifth Circuit affirmed.  See Berniard v. Dow Chemical Co., 481 Fed.Appx. 859, 863-64 (5th Cir. 2010)(holding that the defendants failed to satisfy their burden to show that the $5 million amount in controversy was facially apparent).[5]

---

[4] While the case was pending in this Court, the magistrate judge granted in part the plaintiffs' motion to amend the petition to add Steve Milligan as a defendant.  To this date, there is apparently no evidence that Milligan was ever served with process.

[5] The Fifth Circuit observed:

> Defendants-Appellants' bald exposure extrapolations are insufficient to establish the likely number of persons affected by the release or, for those affected, the severity of their harm.  [W]e conclude, as did the district court, that, even when properly aggregated, the nature, timing, geographical extent, numerosity of the affected population, and nature of damage allegedly caused by this isolated, quickly controlled, and geographically limited EA escape, as pleaded in the several state court petitions, does not make it facially apparent that the stakes plausibly exceed $5 million....  Given the generalized and conclusional nature of the allegations of the several petitions and complaints..., we cannot say that...the Defendants-Appellants carried their burden of showing not only what the stakes of the litigation could be, but what they are in light of the plaintiffs' demands.  Like the district court, we conclude that the Defendants-Appellants have failed to present a plausible explanation of how the claims of the

Back in state court, in mid-May 2011, a class certification hearing was conducted. During the hearing, counsel for defendants submit, class counsel stated that they had been retained by approximately 2,800 individuals in connection with the July 7, 2009 EA release.[6] Months later on December 15, 2011, the state court issued a judgment granting the plaintiffs' motion for class certification, approving three class representatives[7] for a class defined as:

> [T]hose persons living or located in [defined] geographic areas...who were present in these locations for some time, from 4:30 am on July 7, 2009 until 3:30 p.m. on July 8, 2009, and who experienced the physical symptoms which include any or all of the following -- eyes, nose, or throat irritation, coughing, choking or gagging, or nausea, or headaches, dizziness, trouble breathing or other respiratory issues, as a result of

---

class plaintiffs could equal or exceed $5 million. The Defendants-Appellants' methodology is speculative and unconvincing. They overstate the reach of the plaintiffs' petitions by improperly equating the geographic areas in which the potential plaintiffs might reside with the population of the class itself. Further, the comparisons that the Defendants-Appellants make to damages recovery in similar cases is too attenuated to satisfy their burden.

Id. at 863-64.

[6] The plaintiffs appear to dispute this, or at least take issue with the defendants' failure to cite to any document memorializing such representation by plaintiffs' counsel. The defendants make this representation in their present notice of removal.

[7] Ramona Alexander, Vanessa Williams, and Melissa Berniard were approved as class representatives. Because Melissa Berniard is married to one of the attorneys appointed as class counsel, she was later disqualified by the Louisiana Supreme Court. Along with Ramona Alexander and Vanessa Williams, Henry Holmes and Bates Whiteside were later added as class representatives.

4

their exposure to Ethyl Acrylate or other chemical
substance released from tank 2310 at Union Carbide
Corporation's Taft, Louisiana Facility. Those persons
living or located in these geographic areas and who
experienced any of these physical symptoms will
constitute the class and will be bound by the decision
of this case.

On June 19, 2014, the state court ordered the plaintiffs to provide notice to the class, including to provide instructions on the process by which a class member could opt out of class membership.[8] Following class notice, approximately 5,000 individuals, whom had already retained counsel other than Guidry class counsel, opted out of the Guidry class action. These 5,000 individuals had filed individual claims in a consolidated mass joinder action in St. Charles Parish entitled Mark Dufour and Pierre Carmouche v. Dow Chemical Company.[9]

Meanwhile, discovery was supposedly completed in 2015 and the case plodded along towards a monthlong September 9, 2019 bench trial date in state court. But just a few weeks before the scheduled trial, on August 20, 2019, UCC and Dow removed the case

[8] Although the defendants requested that the notice to the class also include a proof of claim process for all putative class members prior to the class-wide trial, plaintiffs' counsel objected and the state court denied the defendants' request. As a result, no putative class members have been required to make their claims known to the defendants in this case.
[9] Those 5,000 individuals apparently chose to pursue their claims on an individual basis in the venue in which those claims were already asserted.

to this Court, invoking the Court's Class Action Fairness Act
jurisdiction for the second time in 10 years. What triggered
removal this time? Six days earlier on August 14, 2019, in a
letter addressed to defense counsel regarding settlement value,
class counsel Ron Austin wrote that "the parameters of a possible
settlement can be safely couched in terms of a range from $60
M[ILLION] to $275 M[ILLION]."

The plaintiffs now move to remand, arguing _not_ that the
$5,000,000 amount in controversy requirement is lacking, but,
rather, that removal is untimely because the defendants should
have known years earlier the "potential class size" and that the
plaintiffs' transient health impacts damages could exceed
$5,000,000. The plaintiffs identify earlier "other paper," which
(it is argued) should have indicated to the defendants the size of
the class and, therefore, the quantum of damages at stake in this
litigation and, thus, triggered the 30-day removal clock, which
has since expired.[10] Significantly, the plaintiffs also suggest
that the only "other papers" indicating class size and case value

---

[10] "Other paper" is a legal term of art in removal process. If the
initial pleading does not set forth a removable claim, statutory
removal procedure mandates that the defendant file its notice of
removal within 30 days after it receives "a copy of an amended
pleading, motion, order or" some "other paper from which it may
first be ascertained that the case is one which is has become
removable." 28 U.S.C. § 1446(b)(3).

-- including the plaintiffs' own self-described "musings" in their settlement letter valuing the case between $60 million and $275 million -- are all equally speculative and therefore cannot support removal jurisdiction under the Class Action Fairness Act.[11]

I.
A.

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by'" the United States Constitution and conferred by Congress. <u>Gunn v. Minton</u>, 568 U.S. 251, 256 (2013)(citation omitted). Unless Congress expressly provides otherwise, the general removal statute provides that a federal court may exercise removal jurisdiction over state court actions if the federal court would have original jurisdiction over the case -- that is, if the plaintiff could have brought the action in federal court from the outset. <u>See</u> 28 U.S.C. § 1441(a). In 2005, Congress vested federal district courts with original jurisdiction over certain class actions when it passed the Class Action Fairness Act, 28 U.S.C. § 1332(d), "in response to perceived misuse of the class-action device." <u>Scott v. Cricket Communications, LLC</u>, 865 F.3d 189, 194 (4th Cir. 2017)(citation omitted). "CAFA gives federal courts [original] jurisdiction over

_____

[11] That there is only speculation to support class size and value after 10 years of litigation persuaded the Court that oral argument would be helpful.

7

certain class actions...if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." <u>Dart Cherokee Basin Operating Co., LLC v. Owens</u>, 574 U.S. 81, 135 S. Ct. 547, 552 (2014)(citations omitted).

> To "determine whether the matter in controversy" exceeds [$5 million], "the claims of the individual class members shall be aggregated." § 1332(d)(6). And those "class members" include "persons (named or unnamed) who fall within the definition of the proposed or certified class." § 1332(d)(1)(D).

<u>Standard Fire Ins. Co. v. Knowles</u>, 568 U.S. 588, 592 (2013).[12] The Supreme Court has instructed that

> a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation.

<u>Dart Cherokee</u>, 135 S. Ct. at 554.[13]

---

[12] In assessing amount in controversy, CAFA "tells the District Court to determine whether it has jurisdiction by adding up the value of the claim of each person who falls within the definition of [the] proposed class and determine whether the resulting sum exceeds $5 million. If so, there is jurisdiction[.]" <u>Id.</u>

[13] In reaching this conclusion, the Supreme Court explained:
> [W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court.... If the plaintiff contests the defendant's allegation, § 1446(c)(2)(B) instructs: "[R]emoval...is proper on the basis of an amount in controversy asserted" by the defendant "if the district court finds, by a preponderance of the evidence, that the amount in controversy exceeds" the jurisdictional

Although the plaintiffs challenge removal in this case, the removing defendants must establish that federal jurisdiction exists at the time of removal and that removal was proper. <u>See Manguno v. Prudential Prop. & Cas. Ins. Co.</u>, 276 F.3d 720, 723 (5th Cir. 2002). Remand is proper if the plaintiff timely identifies a procedural defect in removal; remand is mandated if at any time the Court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). Given CAFA's broad objective to "ensure[e] 'Federal court consideration of interstate cases of national importance[,]'" the Supreme Court endorsed Congressional intent to read CAFA's provisions broadly; accordingly, "no antiremoval presumption attends cases invoking CAFA." <u>Dart Cherokee</u>, 135 S. Ct. at 554.

*B.*

28 U.S.C. § 1446 governs removal procedure.[14] Subsection (b) pertains to documents that trigger the 30-day time limit for

---

threshold. This provision...clarifies the procedure in order when a defendant's assertion of the amount in controversy is challenged. In such a case, both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.
<u>Id.</u> at 553-54 and 554 n.1 (assuming, without deciding, that § 1446(c)(2) and § 1446(c)(2)(B) apply to cases removed under § 1332(d)(2)).
[14] Defendants predicating removal on CAFA must comply with the time limits set forth in 28 U.S.C. § 1446, except that the one-year

removal; subparagraphs (1) and (3) provide a two-part test for determining whether a defendant timely removed depending on what sort of document triggered removal.  Id.; Bosky v. Kroger Texas, LP, 288 F.3d 208, 209 (5th Cir. 2002); Decatur Hosp. Authority v. Aetna Health, Inc., 854 F.3d 292, 297 (5th Cir. 2017)(citation omitted).  1)  If the "initial pleading *setting forth* the claim for relief upon which such action or proceeding is based" is removable, then the defendant must file its notice of removal within 30 days from receipt of that initial pleading.  28 U.S.C. § 1446(b)(1)(emphasis added).  This initial 30-day clock is triggered "only when that pleading *affirmatively reveals on its face* that" the plaintiff is asserting a cause of action based on federal law.  See Bosky, 288 F.3d at 210 (citations omitted, emphasis in original).  2)  But, if the initial pleading does not set forth a removable claim, the defendant must file its notice of removal within 30 days after it receives "a copy of an amended pleading, motion, order or" some "other paper from which it *may first be ascertained* that the case is one which is has become

_____

deadline for removing cases applicable to the ordinary diversity jurisdiction provision does not apply to cases removed under CAFA. See 28 U.S.C. § 1453; Graiser v. Visionworks of America, Inc., 819 F.3d 277, 282 (6th Cir. 2016); Judon v. Travelers Prop. Cas. Co. of Am., 773 F.3d 495, 508-09 (3d Cir. 2014).  Thus, removal predicated on CAFA may be permissible well into the course of litigation once facts become available supporting removal.  See Judon, 773 F.3d at 508-09.

removable." 28 U.S.C. § 1446(b)(3)(emphasis added). To start the clock under this "other paper" paragraph, the Fifth Circuit has endorsed another bright line rule: the information supporting removal contained in the other paper "must be '*unequivocally clear and certain*[.]'" Bosky, 288 F.3d at 211. Thus, the information supporting removal contained in the "other paper" must state an even clearer case for federal jurisdiction than that required of the complaint.

Like Bosky, the Court finds the comparison between the first and second paragraphs of § 1446 instructive:

> "Setting forth," the key language of the first paragraph, encompasses a broader range of information that can trigger a time limit based on notice than would "ascertained," the pivotal term in the second paragraph. To "set forth" means to "publish" or "to give an account or statement of." "Ascertain" means "to make certain, exact, or precise" or "to find out or learn with certainty." The latter, in contrast to the former, seems to require a greater level of certainty or that the facts supporting removability be stated unequivocally.

Bosky, 288 F.3d at 211 (citations, footnotes omitted).

## II.

The parties dispute only timeliness of removal,[15] not whether CAFA's amount in controversy requirement is met. See Mumfrey v.

---

[15] There is no credible dispute concerning whether this successive removal is permissible. This Court previously determined that the claims stated by the plaintiffs' initial petition were not removable. "As a general rule, once a case is remanded to state

<u>CVS Pharmacy, Inc.</u>, 719 F.3d 392, 398 (5th Cir. 2013)(explaining the distinction between "amount disputes" and "timeliness disputes" and the different standards applicable to each).[16]

*A.*

The plaintiffs present a singular procedural defect challenge to removal: removal was untimely because the defendants had been

_____

court, a defendant is precluded only from seeking a second removal *on the same ground*." <u>S.W.S. Erectors, Inc. v. Infax, Inc.</u>, 72 F.3d 489, 492-93 (5th Cir. 1996)(emphasis in original).  This means that a defendant may invoke the same jurisdictional predicate for removal only if the pleading or event or new facts support that same removal predicate. <u>Id.</u> ("on the same ground" concerns not the predicate for removal jurisdiction, but only "the pleading or even that made the case removable.").  To be sure, the plaintiffs' letter disclosing their damages expectations is a new event supporting the CAFA removal predicate only if "unequivocally clear and certain." <u>Bosky</u>, 288 F.3d at 211.

[16] If the Court had been presented with an "amount dispute," the Fifth Circuit has instructed that the following procedure set forth in § 1446 and <u>Dart Cherokee</u> would apply:

> In <u>Dart</u>, the Supreme Court outlined the procedures and standards for asserting, challenging, and evaluating allegations concerning the amount in controversy for putative class actions removed under CAFA.  First, "a defendant's notice of removal need only include a plausible allegation that the amount in controversy exceeds the jurisdictional threshold," and this "allegation should be accepted when not contested by the plaintiff or questioned by the court[.]"  Next, "[i]f the plaintiff contests the defendant's allegation," then "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."

<u>Carter v. Westlex Corp.</u>, 643 Fed.Appx. 371, 375 (5th Cir. 2016)(unpublished)(internal citations omitted).  To be sure, given that parties cannot confer subject matter jurisdiction by consent, it seems this process is likewise invoked if the Court *sua sponte* inquires into jurisdiction.

placed on notice for many years that the potential class size allowed for damages exceeding $5 million; thus, removal in August 2019 was too late.   The defendants counter that the plaintiffs avoided disclosing and equivocated regarding the potential class size until they wrote the settlement valuation letter on August 14, 2019; this letter was the first paper which allowed the defendants to ascertain that the plaintiffs were in fact seeking damages well in excess of the $5 million amount in controversy. The defendants insist that the letter provided the level of certainty missing for years, finally opened up the removal window, and removal was timely accomplished within 30 days of that "other paper."

Removal in this case is timely only if the facts forming the $5 million amount in controversy theory on which defendants predicate removal jurisdiction were not set forth until class counsel wrote to defense counsel on August 14, 2019.  If, instead, earlier papers identified by the plaintiffs estimating class size "made [the amount in controversy] certain, exact, or precise," then removal is untimely.  When did the plaintiff disclose facts sufficient to trigger federal officer removal?  The procedural defect dispute focuses on whether plaintiffs' statements in state court briefing over the years indicated with certainty or precision that the amount in controversy here exceeds $5 million.   The

plaintiffs identify a litany of expert testimony[17] and statements by plaintiffs' counsel, each of which they argue should have alerted defendants that the case was removable:

(1) in May 2011, depositions of the class representatives were taken in which the four individuals "detailed their health complaints," which were indicative of the types of injuries alleged by the class as a whole, including headaches, nausea, and irritated or burning eyes on the morning of July 9, 2009;

(2) in July 2015, the defendants deposed the plaintiffs' expert toxicologist, Dr. Patricia Williams, who opined on the effects of EA on the class representatives, that levels of EA at 1.3 parts per billion could trigger reflex symptoms similar to the class representatives' complaints;

(3) also in July 2015, the defendants deposed the plaintiffs' plume (air dispersion modeling) expert, who testified regarding his report showing a plume of 10 parts per billion of EA exposure to an area consisting of the majority of St. Charles, Jefferson,

---

[17] There is no dispute that deposition transcripts constitute "other paper" for the purposes of § 1446(b)(3). _Morgan v. Huntington Ingalls, Inc._, 879 F.3d 602 (5th Cir. 2018); _S.W.S. Erectors, Inc. v. Infax, Inc._, 72 F.3d 489, 494 (5th Cir. 1996). Where a defendant removes a case based on facts learned through deposition testimony, the 30-day removal clock starts to run upon the receipt of the transcript of deposition testimony that alerted the defendant that the case was removable. _Morgan_, 879 F.3d at 612.

and Orleans Parish for at least a one-hour average. In breaking down the class representatives' exposure levels, at different locations over the three-parish area, Dr. Zanetti opined that the exposure levels exceeded 1.2 parts per billion and thus would be the same for all class members in the three parishes during the several hour release;[18]

(4) On October 2, 2015, the plaintiffs argued in their opposition to the defendants' motion to decertify the class that there are "tens of thousands (or more) of potential individual litigants who were injured by the defendants' negligence, which would both clog and overwhelm the court's docket (for those who pursue their claims) and result in unredressed wrongs for individuals who opt not to pursue their claims for economic reasons alone."

(5) on May 2, 2016, in a motion to test sufficiency of suspensive appeal bond stated, "[d]efendants' appeal, which plaintiffs consider a mere delaying tactic, will deprive hundreds of thousands of class members of both their day in court and their just compensation."

---

[18] The plaintiffs argue "Dr. Zanetti's and (sic) deposition should have left no doubt in the eyes of the Defendants that the Plaintiffs' class consisted of potentially several hundred thousand claimants over a multi-parish area."

(6) On November 9, 2016, the plaintiffs, as appellees before the state appellate court when the defendants challenged the state court's denial of their motion to decertify the class, wrote in their factual summary that "a class was certified consisting of an estimated 200,000 or more plaintiffs from Orleans Parish, Jefferson Parish, and St. Charles Parish." Later in the same filing, plaintiffs wrote that the class "includes up to 200,000 putative class members."

None of these papers started the removal clock. The plaintiffs insist that "three simple Google searches reveal the population of" Orleans, Jefferson, and St. Charles Parishes, which combine for a total of 757,413 potential class members, and that "the class was comprised of tens of thousands (or more) and/or, as the plaintiffs contended, several hundred thousand members." These are the type of speculative metrics, the defendants counter, that were rejected by this Court and the Fifth Circuit when the defendants removed this case over nine years ago. These estimates by the plaintiffs, the defendants argue, come no closer than Google to providing the population of the actual class, much less unequivocally establishing that the amount in controversy exceeded $5,000,000. The Court agrees. The plaintiffs' statements in these earlier papers, insofar as they bear on class size at all, are mere argumentative inflations or hopeful estimates as to the number

of potential class members based purely on geography and population estimates. This Court and the Fifth Circuit previously determined that ascertaining class size or amount in controversy based solely on geography and population estimates was too speculative to invoke this Court's limited jurisdiction.[19] The plaintiffs' estimates anchored to these same speculative baselines phrased as argument in state court briefing fail the <u>Bosky</u> test as a matter of law.

None of the plaintiffs' "disclosures" in state court made "certain, exact, or precise" or allowed the defendants "to find out or learn with certainty" facts supporting CAFA jurisdiction. First, insofar as the plaintiffs argue that the defendants should have inferred from the cumulation of these statements over the years that the amount in controversy exceeds $5 million, the plaintiffs misapply <u>Bosky</u>'s bright line rule.[20] Second, although facts obtained from deposition testimony constitutes "other paper" in the abstract, the information identified by the plaintiffs here offer no opinions on class-defining principles, let alone even mere estimates on class size. Third, the plaintiffs' October 2,

---

[19] What is equally mystifying is why, during all these years, defendants apparently did not specifically seek specific information about what damages reparations were at issue.

[20] The bright line rule governing "other paper" does not anchor timeliness of removal to cumulation of piecemeal "clues" to removability.

2015 statement in briefing that there are "tens of thousands (or more) of potential individual litigants who were injured" is, at best, an argumentative estimate, which does not indicate whether it references the Guidry class or all people injured by the release (many of whom are proceeding in litigation in St. Charles Parish). Fourth, the plaintiffs' assertion in state court briefing "...a change in class population from several hundred thousand to several-hundred-thousand-but-a-few-less..." may be hyperbole or it may be their hopeful estimate; the source is neither mentioned nor ascertainable. Finally, the plaintiffs' statements on November 9, 2016 regarding the plaintiffs' "**estimated** 200,000 or more" and later in the same filing "**up to** 200,000 putative class members" (emphases added) are at best argumentative equivocal estimations. Plaintiffs' statements in their state court papers are no more precise in terms of methodology for calculating class size than the population estimates of the affected parishes that was previously insufficient to satisfy this Court and the Fifth Circuit that the CAFA amount in controversy could be satisfied by the transient health impacts experienced by some people in parts of three parishes 10 years ago.

*B.*

Is the August 14, 2019 settlement valuation letter an "other paper" that timely triggered removal?

Post-complaint correspondence from counsel, including settlement statement or demand letters "which [are] not plainly a sham," constitute "other paper" for the purposes of § 1446(b)(3). See Addo v. Globe Life and Accident Ins. Co., 230 F.3d 759, 762 (5th Cir. 2000).[21] The plaintiffs do not contest this well settled principle. Rather, the plaintiffs now downplay the content of

---

[21] In Addo, the plaintiff served a post-complaint demand letter on the defendant, offering to settle the suit over a $5,000 life insurance policy for an amount exceeding $75,000. The plaintiff countered the defendant's $5,000 offer with a $250,000 counter offer. Resolving an issue of first impression, the Fifth Circuit held that a post-complaint letter concerning settlement which is not plainly a sham may qualify as "other paper" within the meaning of 28 U.S.C. § 1446(b). The court reasoned that the demand was a voluntary act of the plaintiff giving the defendant notice of changed circumstances supporting federal jurisdiction. Because the defendant failed to remove the lawsuit within 30 days of receiving the settlement letter (and instead removed based on later answers to interrogatories), the Fifth Circuit vacated the district court's order denying remand and remanded with instructions to remand the case to state court. Id. In a dissenting opinion, Judge Wiener criticized the result reached by the panel majority as encouraging disingenuous pleading and trap-setting:

> it had to have been obvious to all concerned—especially counsel for Addo—that reference to the preposterous sum of $250,000 was neither a serious settlement counteroffer nor a realistic appraisal of the judgment value of his client's lawsuit.... [F]or the purposes of opening [the] removal window, we must...require the presence of a realistic figure in a bona fide writing that demonstrates, in context, a true and functional nexus between the dollars mentioned and the content, context, and circumstances under which such 'other paper' is transmitted and received.

Id. at 763-65.

19

their settlement valuation letter as mere "musings." Critically, however, while the plaintiffs fail to admit that perhaps their letter was a "sham," they do suggest that their "musings" on valuation are just as speculative as any other class size estimates they have tossed around throughout this litigation and should fare no better than what this Court and the Fifth Circuit previously deemed as too speculative to support removal. Thus, they submit that because 10 years of speculation concerning the number of class members persists to this day, there are still no facts supporting amount in controversy (and removability) and, thus, their letter could not have triggered removal.[22]

That plaintiffs now seek to claw back the genuineness or veracity of their letter's content speaks volumes.[23] Although they stop short of casting their letter as a "sham," they downplay the certitude of its contents by characterizing the contents as mere "musings." To be sure, the letter contains a subjective and likely hyperbolized settlement demand. Like plaintiffs' counsel now

---

[22] In so arguing, the plaintiffs either conflate "timeliness" and "amount" disputes or attempt to morph their challenge to removal from a timeliness dispute to an amount dispute. They do so without actually contesting that the amount in controversy requirement is met. Indeed, they make it clear that they seek to recover more than $5 million in damages in this litigation. And so, forum shopping remains the singular priority of both sides.
[23] And is a blow to the professionalism expected of all counsel. See, e.g., 28 U.S.C. § 1927.

appear to concede, their "valuation range" is not a true reflection of the objective value of the case. However, there is absolutely no dispute that plaintiffs' counsel seemingly has a subjective belief that recoverable damages (not even attorney's fees, just damages) range from many multiples beyond the $5,000,000 amount in controversy requirement.

Neither side argues that the plaintiffs' letter is a "sham" within the meaning of Addo. Nor does either side directly addresses whether the Court should assess the substantive reasonableness of settlement valuation letters, or whether for the purposes of assessing timeliness under § 1446, the Court simply takes the letter at face value. Without more, the Court applies Addo and finds that, even assuming the letter betrays boldly optimistic hyperbole, the letter was a voluntary act by the plaintiffs, notified the defendants that the plaintiffs for their own but scantily justified reasons value their case well in excess of $5 million and might satisfy an "other paper" within the meaning of Addo, if the record were more explicit. But only so. See, e.g., Waters v. Lowe's Home Centers, LLC, No. 18-12419, at *1 (E.D. La. April 24, 2019)(noting that "[f]ederal courts give significant weight to the value plaintiffs attach to their claims" and finding it "obvious" from the plaintiffs' settlement demand of $166,508.29 and subjective belief that the case is worth more than $75,000

that the demand, even if the demand inflated, suffices to trigger removal); Monzon v. Lowe's Companies, Inc., No. 16-482, at *4-5 (W.D. Tex. May 26, 2017)(noting an absence of "any case in which a post-complaint letter was deemed to be 'plainly a sham' such that the letter could not serve as a basis for removal," declining to allow "a plaintiff to fend off federal jurisdiction by repudiating...a demand after removal would create the potential for [forum] manipulation," but nevertheless finding that the same letter that served as "other paper" triggering removal was insufficient for defendants to satisfy their preponderance burden on the substantive question of removal); Raborn v. ConWay Truckload, Inc., No. 15-2969, 2015 WL 6738599, at *3 n.35 (E.D. La. Nov. 4, 2015)(collecting cases in which district courts looked to settlement demand letters as "relevant evidence" of the amount in controversy); Marullo v. Dollar General Corp., No. 14-1131, 2014 WL 3587879, at *2 (E.D. La. July 21, 2014)(same); Cole v. Knowledge Learning Corp., No. 09-2760, 2009 WL 1269591, at *4 (E.D. La. May 6, 2009)(Africk, J.)(finding that plaintiff's counsel's letter demanding $125,000 to settle a personal injury claim for which the plaintiff had incurred $4,250 in special damages qualified as "other paper" to trigger removal based on diversity jurisdiction), aff'd sub nom. Cole ex rel. Ellis v. Knowledge Learning Corp., 416 Fed.Appx. 437 (5th Cir. 2011); Russell v. Home

22

<u>State Cnty. Mut. Ins. Co.</u>, No. 03-1911, 2003 WL 2267179, at *3 (E.D. La. Nov. 10, 2003)(holding that plaintiff's settlement demand was not plainly a sham and rejecting plaintiff's argument that counsel's settlement letter was mere posturing and did not reflect an honest assessment of the case).

To determine whether the plaintiffs provided unequivocal facts supporting removability, or made removability "certain, exact, or precise" requires scrutinizing the letter's contents; plaintiffs' counsel writes to defense counsel:

Dear Neil:
    Thank you for the call yesterday concerning your objections to our trial subpoenas. Defendants' objections were anticipated and we will meet those objections in court.
    On to the more important topic of mediation: I told you I was reluctant to make a formal demand in advance of a scheduled mediation because I do not want to create a barrier to meaningful settlement negotiations. But I recognize you do have to bring something to your client to obtain approval to mediate.
    Here is our analysis. As indicated, we believe we will win at district court and hold at the Fourth Circuit. In <u>Howard v. Union Carbide Corp.</u>, plaintiffs suffered relatively minor symptoms from their exposure, such as watering eyes, nose or throat irritation, coughing, and headaches. We **believe** the district court will move north of Howard [damage awards, which were reduced by the state high court to $100 to $500] to a $750.00 low/$2000 high. We believe there are some 600,000 people inside of the class as it stands. A median number of $1375.00 x 600,000 is $825 M, plus judicial interest, which runs about a third of the total value on a 10 year case at this point.
    To further the analysis, let's **assume** we get a 30% response which would reduce the total number of people down to 200,000. At the median rate of $1375, we arrive

at a $275M potential base-judgment value. Obviously from Defendants' point of view, you will look to Howard and argue the value is $100 to $500.00, for an average of $300 times a potential class of 200,000, or $60M.

Based on the above, **the parameters of a possible settlement can be safely couched in terms of a range from $60M to $275M. These are reasonable parameters** and take into consideration what [plaintiffs' counsel] believes is reasonable and also what Defendants will argue to the district court, the Fourth Circuit and the Supreme Court.

We recognize Defendants may opt to propose a different bracket, but that is a matter which should be more fully explored during mediation.

If your clients are willing to enter into serious negotiations at this time, please let me know....

(emphasis added).

Although the letter appears patently conjectural at 10 years into litigation, the plaintiffs do make certain that, it is their opinion, their class damages exceed the $5 million threshold for CAFA jurisdiction.[24]

### III.

That the "valuation" letter opened the removal window sufficient to render removal *procedurally* proper, however, does not mean that the letter suffices to demonstrate that it is more

---

[24] If the plaintiffs wished to trigger the 30-day removal period sooner, they could have provided unequivocal settlement demands or other documentation to opposing counsel indicating the quantum at stake. Here, that could have taken the form of simply disclosing how many class members comprise this particular class. Or, failing that, the plaintiffs could have sent the defendants their assessment of the case value. The first time the defendants received any document from which they could ascertain the amount in controversy the plaintiffs placed at stake was plaintiffs' counsel's settlement letter.

likely than not that the amount in controversy is met for the Court to exercise jurisdiction under CAFA. In other words, neither the "information" contained in the letter, nor all parties' apparent concession that the amount in controversy exceeds $5 million suffice to make it so. For jurisdiction cannot be conferred by the parties' consent.

That the plaintiffs singularly challenge timeliness of removal does not end the Court's inquiry into its own jurisdiction. To be sure, a defendant cannot establish removal jurisdiction by mere speculation and parties can neither concede that it exists nor proselytize beliefs which, if true, would support its exercise. Thus, the Court finds that it must be satisfied, by a preponderance of the evidence, that the amount in controversy requirement is met.[25] Determining whether $5 million is realistically at stake in this lawsuit must be more clear and certain. It seems that the only process that will facilitate ascertaining this objective metric of jurisdiction is for plaintiffs' counsel to conduct, a (sworn) claims and discovery process.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion to remand is DENIED without prejudice.

---

[25] If the Court exercised jurisdiction based solely on the plaintiffs' self-described "musings" in their settlement letter, then it would be tantamount to concluding that jurisdiction is conferred at a party's whim.

Plaintiffs shall complete jurisdictional discovery within ninety days, after which the Court will consider another motion to remand, if necessary, based on the size of the class and specifics about class member symptoms.

New Orleans, Louisiana, September 19, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE